MJL:BTR
F. #2005R00022
OCDETF-NYE476

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                05-CR-196(S-8)(SJF)

ANGELO S. RUGGIERO,

         Defendant.

- - - - - - - - - - - - - -X


GOVERNMENT'S MOTION
<u>SEEKING AN ANONYMOUS JURY</u>


ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York


BURTON T. RYAN, JR.
Assistant U.S. Attorney
    (Of Counsel)

A TRUE COPY
ATTEST
DATED 9/26 2007
ROBERT C. HEINEMANN
CLERK
BY [signature]
DEPUTY CLERK

Case 1:07-cr-00927-LMM    Document 2-8    Filed 10/03/2007    Page 2 of 21
Case 2:05-cr-00196-SJF    Document 234    Filed 09/19/2007    Page 2 of 21

2

<u>PRELIMINARY STATEMENT</u>

The government moves to empanel an anonymous jury at the trial of this case. Specifically, the government requests that the names, addresses and places of employment of the prospective jurors not be revealed to either the defendant or his attorney.

As set forth below, empaneling an anonymous jury in the trial of this case is warranted to assure the public's right to a fair trial by protecting the jury from interference from the defendant, his criminal associates, the media and others. Moreover, these precautions will not deprive the defendant of his rights to a meaningful jury selection nor diminish the presumption of innocence.

3

### STATEMENT OF FACTS

The defendant, Angelo S. Ruggiero, is one of the last three defendants[1] awaiting trial on charges of participating in a long-term conspiracy to grow and distribute marijuana and launder the profits. Twelve co-defendants charged in the indictment have previously admitted their guilt.[2]

This group of co-conspirators was organized and led by career criminals who were either associates or members of organized crime. Discipline in the drug market was enforced through threats of violence, including murder. These acts engaged in by the co-conspirators include: (i) the arming with illegal weapons of individuals involved in the distribution of the drugs; (ii) assaults and beatings of drug distributors and customers; (iii) extortion and theft of monies and assets from individuals associated in the drug trade; and (iv) the shooting and murder of a competing marijuana distributor.

Angelo Ruggiero is a soldier in the Gambino organized crime family of La Cosa Nostra and was a member of the crew of Gambino capo Michael "Micky" Paradiso. One of Angelo Ruggiero's

---

[1] Vincent Saporito and Henry Navarra are also awaiting trial; on September 19, 2007, the Court severed their cases from Ruggiero's for trial.

[2] Co-conspirators who have previously entered guilty pleas include: Peter Zuccaro, also known as "Bud," Leonard Palone, Pasquale J. Andriano, John Andriano, Richard Brownrigg, Daniel Bowles, Harry Gabor, Joseph Iorio, Joseph Lampasona, Sean Lennon, Michael Lezamiz and Richard Schwerdt.

criminal interests involved providing "protection" for a door-to-door drug delivery service known as "Smiles."  This drug delivery organization employed a series of couriers, who, using motor bikes, primarily distributed high quality hydroponic marijuana to individual customers in New York City.

Louis Ruggiero, Angelo Ruggiero's brother, an uncharged co-conspirator, provided illegal handguns to the organizer of "Smiles," and participated in beatings, in which those weapons were used, to assist in enforcing discipline where drug debts were unpaid.  Angelo Ruggiero, Louis Ruggiero and John "Johnny Boy" Ruggiero, a third brother, an uncharged co-conspirator, and all associates or members of organized crime, all obtained payments from the sale of marijuana by the organizer of "Smiles."

Peter Zuccaro was well known for his use of violence on behalf of the Gambino family.  Zuccaro assisted the organized crime family by planning and committing, with or for various members, a series of crimes.  These include: robberies, thefts and murder, including the murder of a local marijuana dealer.  Zuccaro enforced discipline in his drug organization by the threatened use of violence.

Zuccaro, a Gambino crime associate for many years, supported himself by operating a series of indoor hydroponic marijuana cultivation operations.  Zuccaro and his partner,

Case 1:07-cr-00927-LMM    Document 2-8    Filed 10/03/2007    Page 5 of 21
Case 2:05-cr-00196-SJF    Document 234    Filed 09/19/2007    Page 5 of 21

5

Leonard Palone, employed over a dozen individuals to assist them in the cultivation.  Eventually, the operation grew to incorporate a number of adjoining buildings in Brooklyn, New York, across from a public school.  Zuccaro and Palone hid the primary nature of their business in the warehouse by investing drug proceeds to establish a "cover" business called A-1 Precise, Inc. ("A-1") that was also in the warehouse.  A-1 used the money from the drug sales to purchase used automobile catalytic converters and sell them for the recovery of their precious metals.  Their hydroponic marijuana operation grew a number of "harvests" each year.  Multiple individuals, trusted to keep the operation secret, were employed to "harvest" the marijuana. Included among these individuals were co-defendants Henry Navarra and Vincent Saporito.  Saporito was also employed in the operation of A-1.[3]

In time, during 2002 and 2003, Zuccaro approached Angelo Ruggiero and, following lengthy negotiations, recruited Ruggiero to help distribute the Zuccaro's marijuana.  In May 2003, Gus Fakiris, the organizer of "Smiles," was summoned to a meeting with Ruggiero.  Fakiris had sold his interest in "Smiles" and was retired from the drug distribution business.  Angelo

---

[3]  Both defendants were eventually discovered to be thieves. Navarra was found stealing marijuana, Saporito was later found to be stealing catalytic converters.

6

Ruggiero, however, told Fakiris he wanted him to deal drugs for another individual.  Fakiris did not wish to do so.   Fakiris was then assaulted by the Ruggiero brothers and finally agreed to Ruggiero's demand that he distribute drugs.  Angelo Ruggiero then introduced Fakiris to Peter Zuccaro.  Gus Fakiris was directed to pay Angelo Ruggiero and his brothers for each pound of marijuana he received from Peter Zuccaro.

While selling Zuccaro's drugs at Ruggiero's direction, Fakiris made regular deliveries of cash drug proceeds to Zuccaro and Ruggiero.  In one incident, Angelo Ruggiero and Peter Zuccaro used Ruggiero's grandmother's wake at a funeral home in Queens to deliver $750,000 in drug cash proceeds from Fakiris.  This money was the proceeds from Fakiris's sale of Zuccaro's marijuana.  Because Fakiris was late with the money, Angelo Ruggiero intentionally tripped Fakiris, sending him down a flight of stairs.

Ruggiero was also involved in an attempted murder in Howard Beach, New York, on Sunday morning, May 4, 2003.  Ruggiero arranged for the theft of a car, an Explorer, and recruited three men to accompany him.  Ruggiero and his accomplices pulled up behind the victim, who was sitting in his car getting ready to go to work.  One of Ruggiero's accomplices jumped out of the Explorer brandishing a handgun and shot the victim, who still managed to drive away, even as Ruggiero's crew fired shot after

7

shot, shattering the rear window.  The victim then obtained assistance from the police and emergency medical personnel. Later, Ruggiero had Peter Zuccaro torch the Explorer.

Finally, someone has already attempted to tamper with potential government witnesses in this case.  First, one potential government witness was approached by individuals in a car that drove by the witness's place of business.  One occupant yelled out that the individual better "do the right thing in September" and made a gesture with his finger and thumb indicating a pistol shooting at the potential witness.  Second, this witness also received suspect telephone calls shortly after the witness was arrested and began cooperating with the government.  Third, a co-defendant was approached by Angelo Ruggiero, who offered to arrange a discounted or subsidized representation for the co-defendant if the co-defendant would work with Ruggiero's investigator.

While the government has taken steps to protect these witnesses, we strongly believe that Ruggiero's history and associations require this Court to take steps to ensure the jury is protected.

8

ARGUMENT

POINT ONE

ANONYMITY IS A WELL-ESTABLISHED MEANS
OF ENSURING THE IMPARTIALITY OF A JURY

The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of trials and ensure an impartial jury. This is especially true where jurors may be unwilling to return a verdict based on the evidence because of fear of retribution unless they are assured their identities will be protected. See United States v. Aucilino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987).

Jurors whose identities are known are subject to pressure, intentionally or unintentionally, by criminal associates, relatives, friends, colleagues or others to return a verdict based on factors other than the evidence in the case. Those risks will be minimized if the identities of the jurors remain undisclosed. Moreover, even if no one improperly approaches a juror, the fact that the jurors know that their identities are publicly known may subtly and unconsciously impair their impartiality. An anonymous jury, however, will be in the best position to resolve the issues of this case without fear or

favor to any party and without concern about being attacked, threatened, or second-guessed for its verdict.

The Second Circuit has adopted a two-step process for determining whether to empanel an anonymous jury. The Court should first determine whether there is strong reason to believe that the jury needs protection. If such a determination is made, the Court should then take reasonable precautions to minimize any prejudice that an anonymous jury might have. See Aulicino, 44 F.3d at 1116 ("the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the Court conducts a voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities.") See also Amuso, 21 F.3d at 1264-65; United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991), cert. denied, 505 U.S. 1220 (1992). Within these general guidelines, the decision to use an anonymous jury is "left to the district court's discretion." Paccione, 949 F.2d at 1192; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990), cert. denied, 501 U.S. 1211 (1991).

The Second Circuit has identified various factors in determining the propriety of ordering an anonymous jury: (1) the seriousness of the charges; (2) the dangerousness of the defendant; (3) the defendant's ability to interfere with the

Case 1:07-cr-00927-LMM   Document 2-8   Filed 10/03/2007   Page 10 of 21
Case 2:05-cr-00196-SJF   Document 234   Filed 09/19/2007   Page 10 of 21

10

jury, either himself or through a criminal organization of which he is a member; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that might impair their ability to be fair. See Aulicino, 44 F.3d at 1116; Paccione, 949 F.2d at 1192-93; United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991), cert. denied, 502 U.S. 1036 (1992); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990); Persico, 832 F.2d at 717 (anonymous jury appropriate based on history of violence, willingness to obstruct justice, and expected publicity); United States v. Ferguson, 758 F.2d 843, 854 (2d Cir.) (anonymous jury appropriate where evidence at trial would include discussions of killing government witnesses and where district court articulated the need to protect jurors' "privacy from the press"), cert. denied, 474 U.S. 841 (1985); United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir.), cert. denied, 474 U.S. 819 (1985); United States v. Barnes, 604 F.2d 121, 141-42 (2d Cir. 1979) (anonymous jury appropriate due to extensive pretrial publicity and abundant allegations of dangerous and unscrupulous conduct), cert. denied, 446 U.S. 907 (1980).

As set forth below, all five of these factors strongly favor empaneling an anonymous jury in this case. Further, the

11

use of an anonymous jury in this case would not impair the
defendant's right to a fair trial.

A.    The Defendant Faces Serious Charges

The defendant is charged with conspiracy to distribute
over 1000 kilograms of marijuana, an offense for which he faces a
minimum of ten years imprisonment and a possible life sentence.
The prospect of such a stiff sentence clearly gives the defendant
a motive to tamper with the jury.

B.    The Defendant Is Dangerous

Angelo Ruggiero has repeatedly demonstrated both his
willingness and ability to commit violent acts.  As described
above, he routinely used extortion and physical violence against
those under his command as a means of control.  He sent Gus
Fakiris down a flight of stairs.  He directed the shooting and
attempted murder of a Howard Beach man on behalf of the Gambino
family.  The jurors, who will hear much and maybe all of this,
are likely to be concerned for their safety.

C.    The Defendant's Ties To The Gambino Family
      And The Family's History of Witness
      Tampering Favors Empaneling An Anonymous Jury

Angelo Ruggiero is a soldier in the Gambino family.
The Second Circuit has repeatedly approved the use of anonymous
juries in cases involving defendants with ties to organized
crime.  See, e.g., Amuso, 21 F.3d at 1264-65; Locascio, 6 F.3d at
946-47; Vario, 943 F.2d at 240; Persico, 832 F.2d at 717.  The

12

Second Circuit has emphasized, however, that the mere fact that a case involves organized crime does not, by itself, justify use of an anonymous jury unless there is "something more." <u>Vario</u>, 943 F.2d at 241. "This 'something more' can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety." <u>Id</u>.

Following <u>Vario</u>, courts in the Eastern District of New York have empaneled anonymous juries in organized crime cases. <u>See</u>, <u>e.g.</u>, <u>United States v. Orena</u>, No. 92 CR 351 (E.D.N.Y. 1992) (Weinstein, J.) (empaneling partially anonymous and partially sequestered jury in trial of Colombo family members); <u>United States v. Gigante</u>, 924 F. Supp. 140 (E.D.N.Y. 1997) (Weinstein, J.); <u>United States v. Persico</u>, No. 04 CR 911 (E.D.N.Y. 1994) (Johnson, J.) (empaneling anonymous and partially sequestered jury in trial of Colombo family members); <u>United States v. Basciano</u>, No. 05 CR 929 (E.D.N.Y. 2007) (Garaufis, J.) (empaneling anonymous and partially sequestered jury in trial of Bonanno family members); <u>United States v. Bisaccia</u>, No. 93 CR 479 (E.D.N.Y. 1993) (Glasser, J.) (empaneling anonymous and partially sequestered jury in trial of Gambino family member and

Case 1:07-cr-00927-LMM    Document 2-8    Filed 10/03/2007    Page 13 of 21
Case 2:05-cr-00196-SJF    Document 234    Filed 09/19/2007    Page 13 of 21

13

associate); <u>United States v. Malpeso</u>, No. 93 CR 1365 (E.D.N.Y.

1993) (Dearie, J.).

The Gambino family has a long and rich history of jury

tampering.[4]  For example, in 2003, long-time Gambino captain

Anthony Ciccone and Gambino soldier Primo Cassarino were involved

in a witness tampering scheme charged in <u>United States v. Gotti</u>,

---

[4]  For example, in <u>United States v. Gotti</u>, No. 85 CR 178
(EHN) (E.D.N.Y.), John Gotti and seven co-defendants were tried
on racketeering charges, involving loan sharking, gambling, armed
robbery and murder.  Even after an anonymous jury was selected,
one of the empaneled jurors, George Pape, conspired with members
of the Gambino family to secure Gotti's acquittal.  Pape was
thereafter convicted for his role in the obstruction of justice
in that case.  <u>See</u> <u>United States v. Radonjich</u>, 1 F.3d 117, 119
(2d Cir. 1993).

Another illustration of the Gambino family's
willingness and ability to tamper with juries occurred during the
racketeering and narcotics prosecution of John Carneglia and Gene
Gotti, a Gambino soldier and the brother of John and Peter Gotti.
The defendants' first trial resulted in a mistrial when the
government received information that the jury had been tampered
with by a Gambino family associate.  In rejecting the defendants'
claim that a retrial was barred by double jeopardy principles,
the Second Circuit held that "the evidence did raise a 'distinct
possibility' that the defendants had identified several anonymous
jurors and had tried to influence one or more of them.'" <u>United
States v. Ruggiero</u>, 846 F.2d 117, 123 (2d Cir. 1988).  At the
defendants' retrial, Gambino family soldier Carmine Agnello
offered $25,000 to a juror to vote for an acquittal.  <u>See</u> <u>United
States v. Ruggierio</u>, 928 F.2d 1289, 1290-91 (2d Cir. 1991).
Fortunately, during jury deliberations, the tainted juror was
removed from the jury after he claimed that he had been
threatened.  Thereafter, the jury returned a verdict of guilty.
        Further, Larry Bronson, a defense attorney, is
presently under indictment in this district in part for helping a
Gambino family associate, Steve Kaplan, engage in a systematic
pattern of witness intimidation and persuasion, first to prevent
Kaplan from being indicted, then to influence the results of the
trial when he was.  The case is pending.

14

No. 02 CR 606 (E.D.N.Y. 2003) (Block, J.), a racketeering trial,

in which Peter Gotti was a defendant.  Two defendants were

convicted of witness tampering.[5]

Further in <u>United States v. Ambrosio</u>, No. 03 CR 425

(E.D.N.Y. 2003) (Seybert, J.), Michael Guerrieri, a Gambino

soldier, tampered with a loanshark victim.  Two weeks prior to

trial, a victim-witness fled the country after being visited by

Guerrieri at the witness's place of business.  Guerrieri

instructed the victim that should he be called to testify at

Guerrieri's trial, he should state that the loan was from a

different individual.  The witness told Guerrieri that he

understood and thereafter left the country until the resolution

of the case against the defendants.

In short, the actions taken by Gambino family members

and their associates in the past suggest that Ruggiero, a Gambino

---

[5]    In the same case, extortion victim Francis Molfetta
testified before a grand jury that Ciccone had used extortionate
means to collect money from Molfetta.  After testifying in the
grand jury and before trial, Edward Panzer was retained to
represent Molfetta.  Panzer was an officemate of Ciccone's
defendant lawyer George Santagelo.  At trial, Molfetta recanted
his grand jury testimony.  Molfetta was subsequently charged with
perjury and pled guilty.  <u>See</u> <u>United States v. Molfetta</u>, No. 04
CR 453 (E.D.N.Y. 2004) (Weinstein, J.).  In explaining the reason
for his perjury at the <u>Gotti</u> trial, Molfetta said that after he
testified truthfully in the grand jury and admitted that members
of the Gambino family had extorted money from him, he received
phone calls from individuals he believed were criminal associates
of the defendants and was in fear for his life and the safety of
his family.

15

soldier, will direct his associates to tamper with the judicial
process.

D.   The Defendant's Associates Have Made Previous Attempts
     To Interfere with the Judicial Process

        As detailed above, there have already been attempts by
the defendant's associates to tamper with witnesses in this case.
One witness has been warned to "do the right thing in September"
- or be shot.   Another began receiving suspicious phone calls as
soon as he agreed to cooperate with the government.   And Angelo
Ruggiero has tried to co-opt at least one of his co-defendants by
securing him discounted or subsidized representation in exchange
for assisting Ruggiero's investigator.   The defendant's
willingness and demonstrated ability to reach witnesses indicates
that he can do the same to jurors.

E.   There is Likely to be Media Coverage of this Trial

        Finally, courts have ordered anonymous juries in cases
with extensive media coverage, even though the defendant had no
documented history of jury tampering.   See, e.g., United States
v. Nelson, No. 94 CR 823 (E.D.N.Y. 1994) (Dearie, J.); United
States v. Koon, No. 92 CR 686 (C.D. Cal. 1992).   As the Second
Circuit has recognized, pre-trial publicity is a legitimate basis
for empaneling an anonymous jury because such publicity can
enhance the possibility that jurors' names would become public
and thus expose them to intimidation by defendants' friends or
enemies, or harassment by the public.   See Vario, 943 F.2d at

240; <u>Barnes</u>, 604 F.2d at 141 (finding that "[t]he court's decision as to anonymity and sequestration comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality").

At trial, there will likely be public and media attention in this case. Indeed, there have already been a number of media and internet stories about the case and witnesses, including articles in the New York metropolitan newspapers and the internet website "Gangland."

Finally, the jurors may, in light of public scrutiny, feel compelled to return one verdict or another if their identities are not kept confidential. Simply put, a juror whose identity has become known may no longer feel free to cast his or her vote based solely on the evidence. <u>See</u> <u>Barnes</u>, 604 F.2d at 140. In contrast, use of an anonymous jury will ensure that jurors return a verdict based solely on the evidence presented at trial and not out of fear that they will be subject to public scrutiny or personal obloquy from the press or from relatives, friends, neighbors or co-workers because of their verdict.

Case 1:07-cr-00927-LMM    Document 2-8    Filed 10/03/2007    Page 17 of 21
Case 2:05-cr-00196-SJF    Document 234    Filed 09/19/2007    Page 17 of 21

17

<u>POINT II</u>

THE USE OF AN ANONYMOUS AND PARTIALLY SEQUESTERED
JURY WILL NOT DEPRIVE THE DEFENDANT OF MEANINGFUL
<u>JURY SELECTION OR DIMINISH THE PRESUMPTION OF INNOCENCE</u>

Once a district court determines that there is strong

reason to believe that the jury needs protection, it may empanel

an anonymous jury provided that it takes reasonable precautions

to minimize any potential prejudice therefrom.  <u>See</u> <u>Amuso</u>, 21

F.3d at 1264-65; <u>Paccione</u>, 949 F.2d at 1192; <u>Vario</u>, 943 F.2d at

239; <u>Tutino</u>, 883 F.2d at 1132; <u>Persico</u>, 832 F.2d at 717-18;

<u>United States v. Thomas</u>, 757 F.2d 1359, 1365 (2d Cir. 1985).  A

defendant has two legitimate concerns that are potentially

affected by a decision to empanel an anonymous jury: (1) the

right to make informed choices during the jury selection process

and (2) the right to be tried by jurors who are not prejudiced by

reason of their anonymity.  Both of these concerns can be readily

addressed.

A.    Empaneling An Anonymous Jury Does Not
      Burden The Defendant's Ability To Make
      <u>Informed Choices During Jury Selection</u>

Although a defendant has the right to a meaningful <u>voir</u>

<u>dire</u> of potential jurors, <u>see</u> <u>Rosales-Lopez v. United States</u>, 451

U.S. 182, 188 (1981), the decision as to the questions to be

asked in <u>voir</u> <u>dire</u> largely rests within the informed discretion

of the trial judge, <u>see</u> <u>United States v. Silva</u>, 715 F.2d 43, 50

(2d Cir. 1983) (finding that absent a clear abuse of discretion,

18

trial court's ruling on questions to be asked will not be disturbed); Barnes, 604 F.2d at 137-40 (finding, "As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").  As Senior United States District Court Judge Ira Glasser has noted, "The jury selection process (voir dire) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in Barnes."  United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991) (citation omitted).

        The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process.  The names, addresses and places of employment of the prospective jurors are not necessary to an informed choice.  Information regarding the general neighborhoods in which the prospective jurors live and the general nature of their work is sufficient.  The names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful voir dire.  See Georgia v. McCollum, 505 U.S. 42 (1992) (applying rule articulated in Batson, prohibiting use of peremptory challenges in racially discriminatory manner, to criminal defendants).  The common practice in this district of extensive voir dire, including the use of a questionnaire and a

19

jury instruction, further acts to safeguard the rights of the

defendant.

B.    The Court Can Explain The Reasons For
      Anonymity And Partial Sequestration To
      Prospective Jurors In Neutral Terms That Will
      Diminish The Risk Of Prejudice To The Defendant

        Numerous courts have recognized that where anonymity is

necessary, the jurors can receive an instruction from the court

explaining the measures in a neutral way to prevent the jury from

drawing any negative inference.  Although the due process clause

of the Fifth Amendment protects the presumption of innocence,

"there is no per se rule that it may not be burdened."  Thomas,

757 F.2d at 1364; see also United States v. Scarfo, 850 F.2d

1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared

to the Court's interest in safeguarding the integrity of the

judicial process and can be alleviated through a proper jury

instruction.

        Most commonly, courts have explained to jurors that

their privacy and identities need protection from the media and

the curious.  See, e.g., Amuso, 21 F.3d at 1265; Tutino, 883 F.2d

at 1133.  In the Colombo family cases, this Court explained the

jury's partial anonymity by telling prospective jurors that it

would allow them to feel more comfortable in giving candid

answers to the personal questions asked in voir dire and in the

jury questionnaires.  In the Crown Heights case, Senior United

States District Court Judge David Trager explained the jurors'

anonymity by telling prospective jurors that their names,

20

addresses and places of employment would be kept confidential "in order to protect your privacy from press inquiries and others not connected with the case." Either of those examples would provide a credible explanation to prospective jurors in this case.

21

<u>CONCLUSION</u>

For the reasons set forth above, the government's motion for an anonymous jury should be granted.

Dated: Central Islip, New York
       September 19, 2007

                              Respectfully submitted,

                              ROSLYNN R. MAUSKOPF
                              United States Attorney
                              Eastern District of New York

Burton T. Ryan, Jr.
Assistant U.S. Attorney
      (Of Counsel)